TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-01-00023-CV






In the Matter of J.M.M.







FROM THE COUNTY COURT AT LAW NO. 1 OF BELL COUNTY


NO. 181,311-C, HONORABLE EDWARD S. JOHNSON, JUDGE PRESIDING







 J.M.M., a juvenile, was adjudicated delinquent by a jury on one count of indecency
with a child by contact and one count of aggravated sexual assault. See Tex. Penal Code Ann.
§§ 21.11(a)(1), 22.021 (West Supp. 2001). The court sentenced J.M.M. to two years' probation,
sexual offender treatment, and twenty hours of community service. We affirm the trial court's
judgment.


Discussion



 In two issues, J.M.M. argues that the evidence was not factually sufficient to support
his adjudication for either offense. J.M.M. asserts that, in light of conflicting testimony and
considering the medical evidence, the jury's verdict was clearly wrong and unjust.


Standard of Review


 Adjudications of delinquency in juvenile cases are based on the criminal standard of
proof. See Tex. Fam. Code Ann. § 54.03(f) (West 1996). Therefore, we review adjudications of
delinquency in juvenile cases using the standards applicable to challenges to the sufficiency of the
evidence in criminal cases. In re J.S., 35 S.W.3d 287, 292 (Tex. App.--Fort Worth 2001, no pet.); 
In re E.P., 963 S.W.2d 191, 193 (Tex. App.--Austin 1998, no pet.). In a factual sufficiency review,
we begin with the presumption that the evidence supporting the judgment is legally sufficient. 
Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). In reviewing the factual sufficiency
of the evidence, we examine all the evidence in a neutral light. Id. at 129. Evidence is factually
insufficient if it is so weak as to render the verdict clearly wrong and manifestly unjust or the verdict
is against the great weight and preponderance of the evidence. Johnson v State, 23 S.W.3d 1, 11
(Tex. Crim. App. 2000); see also Clewis, 922 S.W.2d at 131-32. The jury decides the credibility of
the witnesses and the weight to be given their testimony, and it resolves or reconciles conflicts in the
testimony, accepting or rejecting such portions as it sees fit. Banks v. State, 510 S.W.2d 592, 595
(Tex. Crim. App. 1974). A jury can accept the State's version of the facts and reject appellant's
version or reject any of the witnesses' testimony. Moore v. State, 804 S.W.2d 165, 166 (Tex.
App.--Houston [14th Dist.] 1991, no pet.).

 The jury adjudicated J.M.M. guilty of two offenses, indecency with a child and
aggravated sexual assault. A person commits the offense of indecency with a child by engaging in
sexual contact with a child younger than seventeen years of age who is not the person's spouse. Tex.
Penal Code Ann. § 21.11(a)(1) (West Supp. 2001). A person commits the offense of aggravated
sexual assault by intentionally or knowingly penetrating by any means, the anus or female sexual
organ of a child under fourteen years of age. Id. § 22.021(a)(1)(B)(i), (a)(2)(B). The testimony of
a sexual assault victim is sufficient evidence of penetration to prove an assault, even if the victim
is a child. Karnes v. State, 873 S.W.2d 92, 96 (Tex. App.--Dallas 1994, no pet.) (victims under
fourteen years of age); Kemple v. State, 725 S.W.2d 483, 485 (Tex. App.--Corpus Christi 1987, pet.
ref'd untimely filed) (victim eight years of age). The State may introduce medical testimony or
physical evidence to support a victim's claim. However, if the victim is younger than eighteen, no
corroboration is necessary; otherwise, no corroboration is necessary to support a victim's testimony
if the assault was reported to anyone other than the defendant within one year after the assault
occurred. Tex. Code Crim. Proc. Ann. art. 38.07 (West Supp. 2001); see Garcia v. State, 563
S.W.2d 925, 928 (Tex. Crim. App. 1978); Karnes, 873 S.W.2d at 96-97; Kemple, 725 S.W.2d at
485.


The Evidence


 At the time of the alleged assault, J.M.M., who was fourteen years old, lived with his
aunt and uncle in Bell County. Their daughter, J.M.M.'s cousin Dawn DiFazio, lived across the
street. At the time, M.W., the five-year-old victim, and her mother lived next door to J.M.M.'s aunt
and uncle. M.W.'s mother was a licensed vocational nurse who worked at a nursing home in
Georgetown. On several occasions, she had arranged for DiFazio, who had two sons around M.W.'s
age, to babysit for M.W.

 On the weekend of December 10, 1999, M.W.'s mother was working the 6:00 a.m.
to 2:00 p.m. shift. Because of her long commute to work, she had to leave her house between 4:30
and 5:00 a.m. DiFazio agreed to babysit M.W. on Saturday and Sunday until M.W.'s mother
returned from work. To avoid anyone else having to wake up as early as she did, M.W.'s mother
also asked J.M.M. to spend Friday and Saturday nights at her house to babysit M.W. from the time
she had to leave for work until M.W. awoke. J.M.M. was to make sure that M.W. was awake,
dressed, and fed breakfast before M.W. went to DiFazio's house each morning. Although J.M.M.
had babysat for his younger sister and DiFazio's sons before, this was the first time he babysat for
M.W.

 Sometime in the late evening hours of Friday, December 10, 1999, J.M.M. arrived
at M.W.'s to babysit. Although M.W.'s mother testified that he arrived around 9:00 p.m., J.M.M.
said that he did not arrive until 11:00 p.m. because he had been Christmas caroling. M.W.'s mother
testified that she and M.W. slept in their bedrooms, and J.M.M. slept on the couch in the living
room. J.M.M., however, remembered that M.W.'s mother offered to let him sleep in her bed, and
she slept on the couch so she would not disturb anyone when she left for work. Both J.M.M. and
M.W.'s mother testified that M.W. wore a pink, zippered sleeper to bed.

 According to M.W., after her mother left for work, J.M.M. woke her up, unzipped
her sleeper, placed his hand inside her panties, and touched her vagina. M.W. testified that he hurt
her by putting his fingers inside her very hard and said that she told him to stop. Afterwards, J.M.M.
told her not to tell anyone what he had done.

 According to J.M.M., M.W. woke him up with noise from the television. He found
her eating breakfast while watching cartoons. He said she was wearing a Pooh Bear nightgown that
came below her knees, rather than the sleeper. He said M.W. asked to play dolls. When he told her
she needed to get dressed instead, she jumped in his lap and started talking about her Barbie dolls.
J.M.M. said as he picked her up, sat her down, and told her to get dressed, her panties fell down. He
said he reached down, looked away , and pulled them up because "little kids aren't supposed to run
around with their underpants down." 

 DiFazio stated that she arrived at M.W.'s house between 8:00 and 8:30 a.m. and saw
M.W. wearing only panties. A Pooh Bear nightgown was crumpled in the middle of the living room
floor. DiFazio helped M.W. get dressed. She noticed M.W. had her hand at her hip to hold up her
underwear and that her panties were sliding down because of the elastic. M.W. spent the day with
DiFazio until M.W.'s mother picked her up.

 J.M.M. returned to M.W.'s house to babysit later that evening. Although J.M.M.
testified that he arrived round 8:00 p.m., M.W.'s mother remembered his arrival time as 9:00 p.m. 
They both said M.W.'s sleepwear was the same as the previous night. M.W. testified that, the next
morning, after her mother left for work, J.M.M. again touched her vagina. When DiFazio arrived
to pick her up, M.W. was still in nightclothes. DiFazio dressed M.W., and returned to her house. 
J.M.M. went home. After work, M.W.'s mother picked up M.W. from DiFazio.

 M.W.'s mother did not have to work on Monday. While watching cartoons that
morning, M.W. told her mother that J.M.M. had hurt her; he unzipped her pajamas, touched her
tummy, pulled down her panties, and touched her "pee-pee." M.W.'s mother had M.W. tell DiFazio
what had happened. M.W.'s mother testified that she took M.W. over to DiFazio's house, but
DiFazio recalls that M.W.'s mother telephoned and asked DiFazio to come over and talk about
something important.

 At trial, M.W. correctly identified an anatomical drawing of a female and labeled
certain body parts, included "butt" and "pee-pee," which is M.W.'s name for vagina. She identified
on the drawing where J.M.M. touched her. She said that J.M.M. was the only person who had
touched her private parts. On cross-examination, M.W. denied that she woke up before J.M.M. and
testified again that he woke her up. She also testified that he did not want to play with her dolls. She
then jumped on him while he was sitting in the living room, and he agreed to play. She said that
when DiFazio arrived, she had already eaten donuts for breakfast and gotten dressed.

 After M.W. told her mother what happened, her mother took M.W. to the Scott &
White Pediatric Clinic to pick up a previously ordered prescription. While at the clinic, they saw
Cathy Pintor, a nurse practitioner who had treated M.W. for several years. M.W.'s mother asked
Pintor to talk to M.W., who told Pintor about the events of the weekend. Pintor testified that she did
not examine M.W. because Pintor is not qualified to perform such an examination. She offered to
call the police and did so the next day.

 After seeing Pintor, M.W.'s mother took her to the Children's Advocacy Center in
Belton, where the director scheduled an examination for the child with Michelle Gerbozy, a sexual
assault nurse examiner at Scott & White. Gerbozy examined M.W. later that week on December 17,
1999, and confirmed that M.W. had sustained injuries to her genitalia. Gerbozy testified that M.W.
demonstrated the way in which J.M.M. had touched her. She also testified that when she asked
M.W. how many times J.M.M. touched her, M.W. said, "Different days."

 Gerbozy then stated that her detailed genital examination of M.W. revealed injuries
"to the inside of her labia minora and the introitus to the vagina on her left side[.] [S]he was tender
to my touch and there was some redness there." She testified that the labia minora are the thinner,
inner lips of the female sexual organ and that the introitus to the vagina is its entrance. Gerbozy
testified that this type of injury was caused by penetration of M.W.'s sexual organ.

 On cross-examination, Gerbozy further clarified that M.W.'s injury constituted an
extended point of injury, rather than two separate injuries. She stated that because the injuries did
not require suturing, they were considered minor and that such injuries "heal by wound regeneration
in 24 to 48 hours, 72 maybe at the most," but healing would depend on the nature of the injury. 
Gerbozy also admitted the possibility that the injury was less than a few days old. Although she
acknowledged that the injury could have been caused by masturbation, Gerbozy also said that
children normally do not masturbate to the point of causing themselves pain. When further asked
if the injury would have been painful if suffered during masturbation, she noted that it was painful
for M.W. when she examined her several days later. 

 Diane Campbell, a clinical social worker, testified that she treated M.W. in a therapy
session in July 2000. Campbell testified that children who have been sexually abused often exhibit
certain behavior patterns and that M.W. exhibited many such characteristic patterns, such as
aggressive behavior, nightmares, angry outbursts, and a tendency to be very clingy with her mother.


Analysis


 J.M.M. bases his claim of factual insufficiency in large part on conflicts in the
evidence. J.M.M. contends the conflicting evidence regarding the clothing that M.W. wore, where
J.M.M. slept when at M.W.'s home, whether M.W.'s undergarments were loose and falling down,
and what time J.M.M. arrived to babysit, renders the evidence factually insufficient.

 On the one hand, the jury had before it conflicting evidence. However, on cross-examination DiFazio admitted that the State had to subpoena her and that she had not relayed to the
State all of the information about which she later testified. In particular, she admitted she had not
told the police or anyone else about M.W.'s underwear having such problems with the elastic that
her panties were falling down. Similarly, J.M.M. also admitted at trial that he had not earlier relayed
certain information about which he testified. The jury also had before it evidence of DiFazio's and
J.M.M.'s family relationship. It was the jury's role to weigh the witnesses' credibility in assessing
how much weight to give to the purported conflicts created by their testimony. See Banks, 510
S.W.2d at 595; Moore, 804 S.W.2d 166.

 J.M.M. also asserts that, according to the testimony of Gerbozy, the sexual assault
nurse examiner, the trauma had to have occurred sometime after J.M.M. last had access to M.W. 
M.W.'s testimony showed that the assaults occurred the mornings of Saturday, December 11 and
Sunday, December 12. Gerbozy examined M.W. on Friday, December 17. The numeric range she
testified to for healing the injury she found was 24 to 72 hours, which would have made the injury
more likely to have occurred after the time on Sunday morning when J.M.M. last had access to M.W. 
However, Gerbozy's testimony was given as a general range and left open the possibility that a
specific injury could heal differently. Again, the jury was free to weigh this evidence and accept or
reject any or all of Gerbozy's testimony. See Banks, 510 S.W.2d at 595; Moore, 804 S.W.2d at 166. 
Further, M.W.'s testimony that J.M.M. penetrated her needed no medical corroboration. Tex. Code
Crim. Proc. Ann. art. 38.07 (West Supp. 2001).

 After reviewing all of the evidence in a neutral light, we cannot say that the evidence
is so weak that it renders the verdict on either offense clearly wrong and manifestly unjust, nor is the
verdict on either offense against the great weight and preponderance of the evidence. We therefore
overrule both of J.M.M.'s issues.

Conclusion


 We have overruled both of appellant's issues. Accordingly, we affirm the trial court's
judgment.



 

 Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices Yeakel and Patterson

Affirmed

Filed: August 30, 2001

Do Not Publish